**The Case for Aggressive Civility (The Bencher July/August 2010)**
**by Lawrence J. Morris**

*The Lord God has given me a well-trained tongue, that I might know how to speak to the weary a word that will rouse them.* Isaiah 50:3

Advocates, not inherently humble people, might forget how well-trained our tongues and the responsibilities and opportunities are they provide us. The words that flow from our mouths, our most powerful weapons, can do enormous good---or undermine the good we try to do. I believe there is no disconnect---it may be a bit too tidy to say no tension---between civility and aggressive advocacy. They are certainly compatible partners, bringing not only justice but also an edified profession with greater trust and support from society. I will suggest an understanding of the advocate's role that might temper incivility, and will propose that there is an element of self-interest and more effective advocacy in a civil approach to trial work. My experience is almost exclusively in criminal law (and military law for that matter), so my observations will reflect those experiences.

**Don't Shoot Me, I'm Only the Lawyer**

We advocates are important but not indispensable. Prosecutors are famously "fungible," as defense counsel remind them---and as I had the chance to contemplate once when returning late from a truly 10-minute 10-minute recess only to hear the judge announce to all present, "go on back, Captain Morris, we're doing just fine without you." As we consume ourselves with the intensity of our trial work, I vote to maintain the intensity but embrace our marginality. I don't mean it as a sort of Zen cool, because a focus on the advocate diverts attention from its proper place---on the client, the cause, or the dispute. Cases are won on the margins and the better advocate has the better chance of nudging that margin in his client's favor. But that's all. If we have bad facts we are likely to lose. If we have bad facts and bad law, we are really likely to lose. If the law and facts generally tip in our favor, we are likely to win even when we may be less skilled than our opponent. In these circumstances, we are often more central to the outcome---everyone realizes the misleading nature of a "won-loss" record---than when we start with big advantages.

Our opportunities for incivility multiply when not all aspects of a case run in our favor and the intensity of our investment in a case tempts us to pleadings, practices, or words that most any observer---not just our opponent, not just a judge, not just a juror, but also a passing citizen, Mom or Dad---would consider incivil, maybe just rude, self-absorbed, and often self-defeating. The temptation is rooted both in a sense that we matter more than we do and in the job hazards inherent in prosecuting and defending cases. The two sides of the excessive advocacy coin warn against sanctimony on the prosecution's obverse and righteousness on the defense's reverse. The tendency toward sanctimony has its roots in a prosecutor's too-personal identification with the victim or the cause, as though he is the embodiment of "the people's" case and not just the person who is privileged to present it in court. Similarly, a defense counsel who bubbles with outrage, legitimate or manufactured, is likely to distract a fact-finder and be willing to win at all costs, because he thinks an injustice transcends the case and client in front of him. Both counsel are mouthpieces in the best sense---not a news anchor reciting a stranger's script, but as advocates that devote the hard work, research, and creativity into creating a case with a theme and foreseeable outcome. Counsel

that do not believe that the clash of prepared and ethical counsel produces justice---or that believe that an unfavorable result would hurt their business or reputations---are most likely to slide toward uncivil practices. Worst of all, such counsel can be pulled off their game, failing to do the blocking and tackling of trial prep and execution, deviating into matters that are not pivotal to the outcome.

Some instances of advocacy overkill might be debatable and case specific (e.g., having a tenuous basis for an objection, determining when and how much discovery to provide), but some are so simple that the cost of incivility to counsel and the process should rule them out. Consider counsel that display disgust or exasperation while an opponent makes an argument or justifies an objection (worse when the opponent might be a public defender or other person with an unpopular client or futile cause). Recall Vice President Gore's famous sighs and grimaces in his second debate with George Bush in fall 2000. Regardless of whether he believed his irritation was justified (and putting aside whether it was feigned or premeditated), what it communicated to the millions watching was, "I am sure superior to this rube, and it's wearing me out having to listen to him and wait my turn." Because we care about our cases and our clients---and because sometimes our opponents are not models of decorum or civility---we don't lack for sigh-provoking behavior; we are fools if we allow ourselves to be goaded into them, however, and because we are marginal, we are wiser and more effective when letting them pass.

**Not Only Good to be Civil, It Might Help Your Cause**

I believe advocates should be civil whatever the cost, and I don't believe that virtuous behavior always yields favorable results---nor that what goes around comes around or that "courthouse karma" wounds all heels. Sometimes a slick operator wins in this imperfect world, and occasionally the unctuous aren't unmasked until it's too late. I do believe, however, that most lawyers are "rules people" and that the rules and conventions of trial work operate not only to encourage and nearly codify civility (disclosure of documents and statements, investigative resources, rules of evidence), but to remind counsel of their marginality. Marginal also does not mean irrelevant---just intensely relevant at the appropriate points. If we are not well-prepared, we are unlikely to deliver captivating opening statements and high quality witness exams. If we were not civil with investigators, victims, and witnesses in the preparation process, we are less likely to have learned information with the accuracy, perspective, or winning anecdote that we otherwise might have---and it will be reflected in our work. We're all familiar with the "great speaker-bad listener" tag. The verse immediately following the excerpt from Isaiah at the top of this article is, "Morning after morning he opens my ear that I may hear." An advocate risks being the clanging and dissonant cymbal of advocacy when the words that flow from his well-trained tongue are not the result of careful preparation, a major part of which is listening well, not only to one's clients, but also to adversaries.

Advocates are builders of their reputations from the time they begin to advocate. As parents and coaches sometimes have regrets about past actions and determine to re-mold their reputations, advocates face the same problem---reputations formed despite ourselves, and rooted in a web of pleadings, arguments, and e-mails, rather than the singular dramatic or clarifying event for which we strive but which infrequently materializes. When I became the Chief Prosecutor for the Office of Military Commissions and had the privilege and opportunity of working with some elite advocates not only in the military, but also at the Justice Department, I was surprised at the amount of time I spent tempering the rhetoric in pleadings. I was well-invested not only in our cause, but also in the integrity of our much-criticized process, but found counsels' pleadings to be an

inappropriate, futile, and demeaning (and public!) outlet for frustrations. Most often the prosecution's pleadings reflected their frustration with their opponents' distorted characterizations of the facts, the dispute, the justness of the government's cause, and sometimes sneers at the prosecutors themselves. Still, little is served by descending to the opponents' level and it does not compromise counsel's advocacy posture to eschew the bait. Besides, the party exhibiting restraint might just attract the notice of a judge, a colleague, and maybe an opponent, who might think to emulate. My experience in that position, as well as my prior position as the Army's Chief Public Defender, and my own years in court yield a few observations that can avoid a corrosive and confidence-splitting conflict between counsel:

**Don't question someone's ethics---unless you are dead serious** (and have consulted a cooler head). When I supervised the Army's defense lawyers I found several instances of prosecutors making hasty ethical allegations, and some supervisors claiming they could not stand in their counsel's way. On the defense side we required approval to file an ethical complaint to a high level, because counsel, understandably heated, are too close to the event and often too inexperienced to comprehend the ramifications; both sides should have such policies, as any ethical allegation is dead serious.

**Don't file a pleading for a collateral purpose, such as publicity or intimidation.** Defense counsel in the commissions process evaded the rules of court, which forbade directly releasing pleadings to the press, by releasing "drafts" moments before filing the actual pleadings. The government was not goaded into a similar practice, but it enabled the defense to accomplish indirectly---laundering press releases in the form of pleadings---what they were unable to accomplish directly.

**Don't file a motion just to consume an opponent's time researching and writing a reply.** Any lawyer of ordinary wiliness can conjure some basis for most any pleading. Counsel should never fail to file pleadings essential to their case, but also should not file junk just because of the glee that it will require work by an opponent.

**Remember that e-mail is communication---and eternal.** It's a great inducement to a comment less likely to have been made in person---and it's guaranteed to be preserved, forwarded, and appended to a motion.

**Say you're sorry.** People make mistakes. Among mine: I was a young defense counsel representing a military policeman in Panama charged with a felony drug offense. I was preparing with my client in the empty courtroom, which a prosecutor used to cut through to his office. I referred to the prosecutor as a bleep, which I of course considered justified, but which the prosecutor heard. I considered whether to apologize (my colleagues stuck with the "truth is a defense" advice), but I did, the sort of imperfect apology that we often see in our clients, as much a regret for having been caught as for having uttered the sentiment. Not only did my opponent accept the apology, he offered me an excellent Honduran cigar---had I known that was coming I might not have wrestled so hard with my conscience.

**It's Not "Go Along to Get Along"**

It is the nature of advocacy to be contentious---it is the adversary process after all, so not every dispute is appropriate for mediators and the like (though advocacy opportunities abound in those settings as well), and we believe that the clash of well-prepared and ethical parties yields about as much justice as we can obtain in this life. Fair play and good humor all contribute to a counsel's reputation for rectitude. Civility does not countenance or connote undue meekness or malleabilityCit is no virtue to be civil and incompetent---but it does carry distinct advantages. Trusted counsel are more likely to be effective negotiators when they are people of their word. Parties do not feel as much need to verify the representations made by those whose word is their bond.

True civility does not require reworking all aspects of an advocate's personality. Civility is not just a matter of style, but is rooted in fidelity to the rules of evidence and procedure and ethics. It is possible, of course, to follow the rules closely and still be a jerk, but careful adherence to the rules will dampen such a tendency. Advocates come from within our society, which shows a tendency toward the narcissistic. Consider post-basket chest bumps, in-your-face prances into the end zone, and the ritual hand slaps even after the player at the line misses a free throw. Counsel can find themselves tempted to perform the courthouse equivalent of those preening and demeaning NFL "sack dances" by the way they react to a judge's ruling, whether a setback or in their favor. And juries see everything.

On the other hand, counsel should not be cowed by a smothering set of "unwritten rules" of advocacy. Baseball is rightly famous and sometimes maligned for its many unwritten rules (e.g., don't steal a base in late innings with an overwhelming lead, don't cut across the infield just to stomp on the pitcher's mound). Many can seem a little quaint and of course all of them have an element of subjectivity to them. Counsel sometimes are brow-beaten by judges or opponents (just stipulate to the chain of custody; counsel do you really need this witness?); in such circumstances it is no breach of civility to aggressively re-assert one's fidelity to client or cause---you need not yield anything when the other side is unwilling to provide fair value in return. Recall Thomas More, in much graver circumstances, reproaching the Duke of Norfolk, who asked him to sign the Act of Supremacy, validating Henry VIII's status of head of the Church of England, "for fellowship." More: "And when we die, and you are sent to heaven for doing your conscience, and I am sent to hell for not doing mine, will you come with me, for fellowship?" A reputation is being forged with every encounter and it can have appropriately favorable results. Counsel should never yield their clients' best interests for the promise of comity, because under such circumstances it would be a false comity and a breach of their primary loyalty. Similarly, civility can be wielded as a bit of a club---witness its use in politics, not infrequently by the party in power, decrying the "loss of civility," which sometimes translates as "the temerity to oppose us." For advocates, it is the difference between invoking the Best Evidence Rule on a photocopy of an obviously valid government document, and stipulating to a key element of an offense or agreeing to stipulate to the testimony of a witness to save the cost or inconvenience of travel, when you think in-person testimony to be critical.

**Serving the Profession and Society**

There are more lawyer jokes than doctor jokes for a lot of reasons, mostly having to do with perceptions of our civility and how we handle ourselves as a profession. The effort of a California Bar Association president in the early 1990's to ban lawyer jokes proved the point to many people. Whether his effort was noble ambition or a misguided foray, I believe that ethical and aggressive advocacy will do more to erode the market for lawyer jokes than a diktat from someone at the acme of the target group.

Just as a person need not be an adherent of the Old Testament to profit from Isaiah's observation at the opening of this article, a person need not be a defender of the faith to appreciate the insight, attributed to Thomas More, "not to hang upon the blast of men's mouths." The challenge to advocates comes at the cluttered intersection of advocacy, ethics, and civility. Following the rules, maintaining a sense of humor---and embracing an advocate's criticality along with his marginality, is the key to effective advocacy…and a good night's sleep.

*Lawrence J. Morris serves as the Chief of Trial Advocacy for the U.S. Army. He retired as a colonel in 2009 after 27 years of service as a judge advocate. His book,* Military Justice: A Guide to the Issues*, was published in February 2010.*

**© 2010 Lawrence J. Morris.** This article was published in the July/August 2010 issue of *The Bencher*, the flagship magazine of the American Inns of Court. Inquiries about this article should be directed to the **American Inns of Court**.

**All counsel of record are required to read "The Case for Aggressive Civility" by Lawrence L. Morris attached prior to the issuance of the Pretrial Scheduling Order.**

Please acknowledge that you have read this article, **and EMAIL THIS PAGE ONLY to Brisbois_chambers@mnd.uscourts.gov, by December 8, 2025,** the due date for the Rule 16 submissions in your case.

**Case Title:** ______________________________

**Case number:** ______________________________

**Party represented:** ___ **PLAINTIFF(S)** ___ **DEFENDANT(S)**

**Counsel printed name:** ______________________________

**Counsel Signature:** ______________________________

**Date:** ______________________________